UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN
_____

In re:

FULL SPECTRUM MANAGEMENT, LLC,

      Debtor.
_____/

Case No. BT 19-00613
Chapter 7

**OPINION GRANTING TRUSTEE'S
MOTION FOR APPROVAL OF COMPROMISE**

Appearances:

Kevin M. Smith, Esq., Rochester Hills, Michigan, attorney for Kelly M. Hagan, Chapter 7
    Trustee.

Sandra S. Hamilton, Esq., Grand Rapids, Michigan, attorney for Independent Bank.

Wallace H. Tuttle, Esq., and Gerald B. Zelenock, Esq., Traverse City, Michigan,
    attorneys for Mark D. Noss, Mark D. Noss O.D., LLC, and MDN Development,
    LLC.

This matter is before the court on the Trustee's Motion for Approval of Compromise

Pursuant to F.R.B.P. 9019 (Dkt. No. 25, as supplemented at Dkt. No. 30).   The proposed

settlement is between Kelly M. Hagan, the Chapter 7 Trustee ("Trustee") and Independent

Bank, successor in interest to Traverse City State Bank (collectively, the "Bank"). The

Bank asserts that Full Spectrum Management, LLC (the "Debtor") owes it approximately

$800,000 under a promissory note dating back to March 2014, and that this obligation is

secured by substantially all of the Debtor's assets.  The Trustee has asserted that she

may avoid the note and the related security interest under 11 U.S.C. § 544.  Under the

proposed settlement, the Trustee agrees not to pursue her potential avoidance claims

against the Bank.  In exchange, the settlement proposes giving the Bank derivative

1

standing to pursue collection of accounts receivable and potential fraudulent transfer claims against Mark D. Noss, Steven Ingersoll, and their related entities. These claims are currently the subject of an adversary proceeding filed by the Trustee and pending before this court. Under the settlement agreement, the Bank would bear the costs of this litigation and provide the estate 25% of any gross recovery.

An objection to the motion to approve the settlement was filed by Mark. D. Noss ("Noss"), Mark D. Noss, LLC, and MDN Development, LLC (collectively, the "Objecting Creditors") in their capacity as unsecured creditors in the case. Noss is the managing member of the Debtor and authorized the filing of the bankruptcy petition. Noss and the other Objecting Creditors are also among the defendants in the related adversary proceeding filed by the Trustee.

The court initially conducted a hearing on March 12, 2020, and required supplemental briefing by the Trustee and the Objecting Creditors. The Trustee filed her Supplemental Motion on March 19, 2020 (Dkt. No. 30) and the Objecting Creditors filed their Response on March 27, 2020 (Dkt. No. 32). On April 1, 2020, the court held a telephonic status conference, and determined to set an evidentiary hearing on the Trustee's Motion. However, at that time, Michigan was (and remains) in the midst of the Covid-19 health pandemic. As a result, scheduling of the evidentiary hearing was delayed several times because the court, and some of the counsel for the parties, did not believe it was safe to conduct an in-person hearing. The court eventually scheduled an evidentiary hearing for August 26, 2020. As that date approached, the parties were not in agreement as to whether the hearing should be conducted in-person or via videoconferencing. The court granted the Objecting Creditors' request for a final

adjournment of the August hearing. *See* Order Granting Motion to Adjourn Evidentiary Hearing on Trustee's Motion for Approval of Compromise (Dkt. No. 47.) Finally, the court scheduled the evidentiary hearing for September 22, 2020, and gave the parties and counsel the option of appearing either in-person or via Zoom videoconferencing. The Trustee, counsel for the Trustee, and counsel for the Bank appeared by Zoom videoconferencing. Counsel for the Objecting Creditors, and Noss, appeared in the Traverse City courtroom wearing protective masks and following appropriate social-distancing policies.

## I.     JURISDICTION.

The court has jurisdiction over this chapter 7 bankruptcy case. 28 U.S.C. § 1334. The case, and all related proceedings and contested matters, have been referred to this bankruptcy court for determination. 28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.). The matter before the court is a core proceeding and this court has authority to enter a final order. 28 U.S.C. § 157(b)(2)(A) and (O); *see In re Junk*, 566 B.R. 897, 904 (Bankr. S.D. Ohio 2017) ("bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure").

## II.     FACTUAL BACKGROUND.

At the evidentiary hearing, the court heard testimony from one witness: Kelly M. Hagan, the Chapter 7 Trustee. The Trustee gave her direct testimony via Zoom video conferencing and was also cross-examined by counsel for the Objecting Creditors through the Zoom platform. The Trustee is an experienced chapter 7 trustee. The Trustee testified that in her sixteen years as a trustee, she has administered

approximately 15,000 cases and has entered into settlement agreements in approximately 2-3% of those cases.  The court found Trustee Hagan credible as a witness.  The court also admitted seven exhibits into evidence.  After the court concluded the evidentiary hearing, it requested that the parties file post-hearing briefs, both of which were filed on October 6, 2020 (Dkt. No. 51 and 52).

A.  <u>Background, Chapter 7 Filing, and the Bankruptcy Estate</u>.

The Trustee's testimony and the exhibits presented at the hearing establish the following factual background for the proposed settlement.  The Trustee explained that prior to 2014, Steven Ingersoll, though his company Smart Schools Management, was party to an Educational Provider Agreement with the Grand Traverse Academy ("GTA").  In March 2014, criminal allegations were raised against Ingersoll, and it was agreed that management of GTA would transition to Noss, and his newly-formed entity, Full Spectrum Management, LLC.  Noss, Ingersoll, GTA, and the Bank engaged in negotiations and ultimately agreed on a process for accomplishing this transition.  Ingersoll and Smart Schools were released from the contract with GTA, and on March 19, 2014, the Debtor entered into a new Educational Provider Agreement with GTA.  (Trustee's Exh. 6.)  The contract had a term of approximately two years.  Under the Agreement, the Debtor was to be paid a minimum of $650,000 per year for the management services provided to GTA.  The maximum amount to be paid per year was $2,000,000.  In addition, all costs incurred by the Debtor under the Educational Provider Agreement were passed on to GTA and reimbursed to the Debtor by GTA.

As part of the transition, the Debtor also assumed Smart Schools' obligations to the Bank.  On March 20, 2014, the Debtor executed a new promissory note, in the

4

principal amount of $925,000 (Trustee's Exh. 2) and a Commercial Security Agreement giving the Bank a lien on substantially all of the Debtor's assets, including the Educational Provider Agreement with GTA (Trustee's Exh. 3; *see also* Trustee's Exh. 4, the UCC Financing Statement). The Debtor also executed a separate Assignment of Agreement as Collateral, which assigned and pledged the Debtor's interest in the GTA contract to the Bank as security for the promissory note.  (Trustee's Exh. 5.)

The Debtor, through Noss, filed a voluntary chapter 7 petition on February 19, 2019.  The Trustee testified that when the Debtor was still operating, the Educational Provider Agreement with GTA, which was subject to the Bank's lien, was the Debtor's primary asset and only source of income.  The estate's only assets at this time are three potential causes of action:

1.   *Avoidance Claim against the Bank.*

The first of the estate's causes of action is a potential claim against the Bank for avoidance of the promissory note, security agreement, and assignment as constructively fraudulent transfers.  If the estate were to prevail on this claim, the Bank's all-asset lien would be avoided and approximately $330,000 in payments made to the Bank under the note could potentially be recovered.  Presumably, the Bank's $800,000 claim against the estate could also be eliminated.  However, in her testimony, the Trustee noted that for the estate to prevail on this claim, it would have to establish that the Debtor was insolvent in March of 2014, when the transaction occurred.  She explained that this could be a difficult burden to meet, because the minimum value of the Educational Provider Agreement was $1.3 million and the debt to the Bank was only $925,000.  She also stated that it could be difficult for the estate to establish that the Debtor did not receive reasonably equivalent

value in the transaction, because there may have been indirect benefits that flowed to the Debtor (specifically, being awarded the Educational Provider Agreement) that would not have occurred absent an assumption of the debt to the Bank.

The Trustee also testified that she believed that the estate would incur significant expenses pursuing the claim against the Bank. These costs would include retaining an expert to value the contract, forensic accounting expenses, and deposition costs. The Trustee stated that the estate has no money to pay these expenses and would likely have to seek litigation funding to pursue the claim. She expressed doubt that the estate would be eligible for such funding.

### 2. Claims against Noss, Ingersoll, and their Business Entities.

The estate also holds claims against Noss, Ingersoll, and their entities for collection of approximately $212,000 in accounts receivable and avoidance of over $790,000 in potentially fraudulent transfers. The claims have been alleged in an adversary proceeding that was filed by the Trustee on April 30, 2020, while the motion to approve settlement was pending. (Trustee's Exh. 7.) According to representations made by counsel for the Trustee and the Bank at the initial hearing on the motion, the adversary proceeding was filed at that time to preserve claims against the defendants under the Michigan Uniform Voidable Transactions Act that would otherwise have been barred by the applicable statute of limitations. The Noss defendants filed an answer to the Trustee's complaint on July 7, 2020, and Ingersoll filed an answer on September 16, 2020, after the default that was previously entered against him was set aside.

The Trustee estimated that it would cost the estate "tens of thousands of dollars" to pursue these claims against Noss and Ingersoll – funds the estate does not have.

Further, even if the claims alleged in the adversary proceeding were ultimately successful, the Trustee testified that she believed any recovery would likely be subject to the Bank's lien. She based this belief on the fact that the funds alleged to have been transferred to the Noss and Ingersoll defendants were assets of the Debtor that were subject to the Bank's security interest. As a result, any recovery of the funds through the adversary proceeding would constitute proceeds of the Bank's prepetition collateral.

3.  *Possible Claim against GTA.*

Finally, the Trustee testified that the estate may have a potential cause of action against GTA, relating to the improper termination of a second Educational Provider Agreement with the Debtor. Again, the Trustee expressed her belief that any recovery on this claim would be subject to the Bank's lien.

B.  The Proposed Settlement.

The Trustee's settlement agreement with the Bank has two main components, which correspond to the first two categories of claims held by the estate. (Trustee's Exh. 1.) First, under the proposed settlement, the Trustee agrees not to pursue avoidance of the promissory note, security agreement, and assignment against the Bank. In exchange, the settlement grants the Bank derivative standing to prosecute the adversary proceeding against Noss, Ingersoll, and their related entities on behalf of the bankruptcy estate. The settlement provides that the Bank will bear all costs of that litigation. If the Bank recovers any money through the litigation, the agreement states that the Bank will pay 25% of the gross recovery to the Trustee, for the benefit of the estate. Any settlement of the adversary proceeding would be subject to the approval of the Trustee, and ultimately the court, pursuant to Bankruptcy Rule 9019. Under the settlement, the Bank's claim in the

7

bankruptcy case would be reclassified as an unsecured claim and would be reduced by any amounts it recovers through the litigation.  At the evidentiary hearing, counsel for the Bank stated that although the settlement agreement lacked clarity on this point, the Bank intended to waive any claim to a distribution from the 25% paid to the estate.  Finally, as a result of the agreement, if the Trustee decides to pursue the estate's claims against GTA, any recovery on those claims would no longer be subject to the Bank's lien and would be paid to the estate.

### III.    LEGAL ANALYSIS.

The primary question before the court is whether the overall settlement with the Bank is fair and equitable and should be approved under Bankruptcy Rule 9019. However, because a main component of the settlement is the grant of derivative standing to the Bank, the court will address the propriety of that proposal as an initial matter.  The court will then address the overall fairness of the settlement agreement and the Objecting Creditors' specific objections.

### A.  Derivative Standing.

The Trustee filed the adversary proceeding against Noss, Ingersoll, and their business entities on April 30, 2020, while the motion to approve compromise was pending. The complaint has fourteen counts and includes claims for recovery of various accounts receivable, as well as avoidance and recovery of certain alleged fraudulent transfers under 11 U.S.C. § 544(b)(1), § 550, and applicable Michigan law.

Section 544(b)(1) provides that the "trustee may avoid" certain transfers of property.  Similarly, if a transfer is avoided, § 550(a) states that the "trustee may recover" property transferred, or the value of such property, for the benefit of the bankruptcy estate.

Derivative standing provides that if the trustee is unwilling or unable to pursue such claims, the court may authorize a creditor to pursue and recover fraudulent transfers for the benefit of the bankruptcy estate.

While often applied in a chapter 11 context where a debtor-in-possession is unwilling to pursue claims, the Sixth Circuit has specifically held that "granting derivative standing to creditors to pursue avoidance actions on behalf of the estate" is "available in both Chapter 11 and Chapter 7 proceedings." *In re Trailer Source, Inc.*, 555 F.3d 231, 245 (6th Cir. 2009). To determine whether it is appropriate to grant the Bank derivative standing here, the court is required to analyze the factors enunciated by the Sixth Circuit in *Canadian Pacific Forest Prods. Ltd v. J.D. Irving, Ltd.* (*In re The Gibson Group, Inc.*), 66 F.3d 1436 (6th Cir. 1995). In that chapter 11 case, the Circuit explained that derivative standing may be granted when:

1) a demand has been made upon the statutorily authorized party to take action;

2) the demand is declined;

3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court, and

4) the inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possession's duties in a Chapter 11 case.

*Gibson Group*, 66 F.3d at 1446. A creditor seeking derivative standing meets its burden when it establishes the first three requirements and the trustee or debtor-in-possession declines to take action without stating a reason. *Id.* This creates a "rebuttable presumption" that the debtor-in-possession or trustee's "failure to bring that claim is unjustified" and the burden to rebut the presumption then shifts to the debtor-in-possession or trustee to give "a reason justifying its inaction." *Id.* at 1442.

9

Here, a demand was made on the Trustee by the Bank, and the Trustee did file the adversary proceeding. This would seemingly cut against the second *Gibson Group* factor. However, as previously discussed, the Trustee filed the adversary proceeding after the settlement motion was filed, but prior to the evidentiary hearing on its approval, due to the Covid-19 pandemic. This was necessary to preserve a claim that might otherwise have been barred by the Michigan statute of limitations. The Trustee's testimony was clear that the estate lacks the resources to prosecute this litigation, and that she would not continue to pursue these claims if the Bank is not provided derivative standing. The court also notes that the Sixth Circuit has explicitly authorized the application of derivative standing after the adversary complaint was filed, noting the "flexible equitable power" of bankruptcy courts to craft remedies in situations where a trustee cannot or will not pursue a claim. *Isaacs v. DBI-ASG Coinvestor Fund III, LLC* (*In re Isaacs)*, 895 F.3d 904, 916 (6th Cir. 2018). Under the circumstances, the court concludes that the first two factors are satisfied – that a demand was made, and that although the adversary proceeding was filed by the Trustee, the Trustee would decline to pursue it further on her own.

The adversary proceeding also sets forth colorable claims against the Noss and Ingersoll defendants. Courts initially look to the face of the complaint to determine whether a claim is colorable. *See Trailer Source*, 555 F.3d at 245 (citing *Gibson Group*, 66 F.3d at 1439). Black's Law Dictionary defines a "colorable claim" as a "plausible claim that may reasonably be asserted, given the facts presented and the current law". Black's Law Dictionary (11th ed. 2019). The court has reviewed the fourteen count adversary complaint and finds that the claims asserted are colorable claims under both Michigan

10

law and the Bankruptcy Code, and that the Bank's pursuit of them would likely benefit the

estate.   This is particularly true given the Bank's willingness to cover all litigation costs

and attorney fees, and to provide a portion of any recovery to the estate which, if

successful, will benefit creditors other than the Bank.

The last *Gibson Group* factor – whether the Trustee's failure to pursue claims is

"unjustified" – is intended to apply when the debtor-in-possession, or trustee, refuses to

file an action, not when (as here) the Trustee has initiated the action out of necessity but

consents to the Bank now prosecuting the action.  Even so, the *Gibson Group* analysis

of this factor is instructive in the present case, where the estate's lack of funds is a primary

factor behind the request for derivative standing.  The *Gibson Group* court explained that:

> [A] bankruptcy court does not err if it finds that a facially justifiable reason for failing to file an avoidance action, such as where a trustee claims that a lack of funds is its only reason for failing to bring the action, is actually insufficient to justify the failure to bring the action if under the circumstances the claim will benefit the estate even after attorneys' fees and costs are deducted.

*Gibson Group*, 66 F.3d at 1443 (citing *In re Automated Business Systems, Inc.*, 642 F.2d

200 (6th Cir. 1981)).

In *Trailer Source*, the Sixth Circuit reaffirmed that it intended for derivative standing

to apply where lack of estate funds may lead to the underenforcement of claims by the

chapter 7 trustee.  The court stated:

> [J]ust as conflicts of interest may lead to underenforcement of avoidance claims by debtors-in-possession in Chapter 11 proceedings, a lack of available funds may lead to underenforcement by trustees in Chapter 7 proceedings. In this situation, we believe that bankruptcy courts should be able to authorize derivative standing for creditors willing and able to prosecute colorable claims that may enhance the value of the bankruptcy estate in Chapter 7 proceedings.

*Trailer Source,* 555 F.3d at 243-44.

11

The court finds that for purposes of the last *Gibson Group* factor, the Trustee's refusal to continue to pursue the adversary proceeding claims meets the "unjustified" standard.  In this case, the proposed settlement establishes that colorable claims exist in the adversary proceeding and that the pursuit of such claims has the potential to benefit the estate.  This creates a presumption that the Trustee's failure to pursue the claims is "unjustified" under the *Gibson Group* test.  Because the Trustee has consented to the grant of derivative standing, she has not attempted to rebut this presumption.  Nevertheless, in support of the proposed settlement, the Trustee has offered a facially justifiable explanation for her inability to continue to pursue the claims – a lack of funds in the estate to pay for the litigation.  Although this explanation is understandable as a practical matter, the Trustee's inability to pursue these claims due to lack of funds is technically insufficient to justify the Trustee's failure to pursue the adversary proceeding under the *Gibson Group* standard.

Finally, the court notes that Judge Tucker from the Eastern District of Michigan has also grappled with applying the *Gibson Group* "unjustified" standard when the trustee consents to the grant of derivative standing.  He reached the same conclusion as this court under the *Gibson Group* factors.  *In re Dzierzawski*, 518 B.R. 415, 424 (Bankr. E.D. Mich. 2014) (holding, based on the reasoning in *Trailer Source*, that the chapter 7 trustee's failure to file claims mostly due to lack of funds was "unjustified").  The *Dzierzawski* court also noted that the Second and Eighth Circuits have specifically held that derivative standing may be authorized not only when a trustee unjustifiably refuses to pursue colorable claims, but also when the trustee consents to the grant to derivative standing.  In such instances, those courts apply a slightly different test:

12

Those circuits have held that when the debtor-in-possession or the trustee consents to the creditor's standing, the creditor still must show that the proposed action is both "necessary and beneficial to the fair and efficient resolution of [the bankruptcy proceedings]," and is "in the best interest of the bankruptcy estate."

*Id.* (citing *In re Racing Services, Inc.*, 540 F.3d 892, 902 (8th Cir. 2008) and *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001)).

Like the *Dzierzawski* court, this court would find derivative standing appropriate in this case even if it were to apply the test utilized in the Second and Eighth Circuits. In reviewing the Trustee's affirmative decision to provide derivative standing to the Bank, the court finds that granting the Bank derivative standing as proposed in the settlement agreement is necessary and beneficial to the fair resolution of this bankruptcy case and is in the best interests of the estate. The Trustee's testimony established that the estate does not have the financial resources to pursue the claims in the Noss adversary proceeding. The proposed settlement gives the estate the ability to share in a portion of any recovery, without incurring the attendant costs of the litigation. The Trustee's decision to consent to the Bank's derivative standing, on the terms set forth in the settlement agreement, also represents an appropriate exercise of her sound business judgment. *See In re Consolidated Industries Corp.*, 330 B.R. 712, 715 (Bankr. N.D. Ind. 2005) (trustees are "given a substantial degree of discretion in deciding how best to administer the estate" and "[s]o long as the trustee's decision concerning how or whether to administer an asset or to pursue a cause of action falls within the proper scope of the trustee's business judgment, the trustee's decision will be upheld") (citations omitted); *cf. In re Wring*, 2015 WL 3824860 (6th Cir. B.A.P. June 22, 2015) (unpublished decision)

13

(explaining that a chapter 11 trustee is generally subject to the business judgment rule when operating a debtor's business).

B.  The Fairness and Equity of the Overall Settlement Agreement.

The standards to be used by the court in evaluating a trustee's motion for compromise or settlement of claims have been set forth by both the United States Supreme Court and the Sixth Circuit Court of Appeals.  Before approving a settlement under Bankruptcy Rule 9019, the court has an "affirmative obligation to apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable."  *Bard v. Sicherman (In re Bard),* 49 F. App'x 528, 530 (6th Cir. Oct. 15, 2002) (unpublished opinion) (citations omitted).  When determining whether a proposed settlement is fair and equitable, the court must weigh four major factors:

(a)    The probability of success in the litigation;

(b)    the difficulties, if any, to be encountered in the matter of collection;

(c)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157 (1968); *In re Bard*, 49 F. App'x at 530 (noting that the *TMT Trailer* standard is comprised of four distinct factors).

Settlements are generally favored by the bankruptcy courts.  "Often, the 'very purpose of such a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious

14

claims.'" *In re SCBA Liquidation, Inc.*, 451 B.R. 747, 768–69 (Bankr. W.D. Mich. 2011) (quoting *In re Bard*, 49 F. App'x at 530) (additional citations omitted); *see TMT Trailer Ferry*, 390 U.S. at 424 ("In administering proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."). Although approval of a proposed settlement is within the bankruptcy court's discretion, courts within the Sixth Circuit "generally accord some deference to the trustee's decision to settle a claim." *In re MVQP, Inc.*, 477 F. App'x 310, 312-13 (6th Cir. Apr. 13, 2012) (citing several cases).

In this case, the only claims that are being compromised are the estate's causes of action against the Bank. The court will analyze the compromise of those claims under the four factors enunciated in *TMT Trailer*. The estate's claims against the Noss and Ingersoll defendants are not being compromised, but rather will be pursued by the Bank under the terms of the settlement. Still, in consenting to the grant of derivative standing, the estate has made some concessions as to how any proceeds of that litigation will be divided. The court has already considered this aspect of the settlement in its derivative standing analysis and will further discuss its impact on the overall fairness of the proposal in its discussion of the fourth *TMT Trailer* factor, the paramount interests of creditors. Based upon Trustee Hagan's testimony, the exhibits admitted into evidence, and the arguments of the parties, the court finds as follows:

1.   *The probability of success in the litigation.*

In her testimony, the Trustee acknowledged that the Bank has strong defenses to the estate's fraudulent transfer claims. In order to prevail on a claim against the Bank under the Michigan Voidable Transactions Act, the Trustee would be required to establish

15

that the transfer was made or the obligation was incurred without receiving reasonably equivalent value in exchange for the transfer or obligation, and that the Debtor was insolvent at that time or was rendered insolvent as a result of the transfer or obligation. *See* Mich. Comp. Laws § 566.35.  First, questions exist as to whether the Debtor received value, and reasonably equivalent value in particular, in exchange for the granting of the security interests in favor of the Bank.  The Bank has argued that the entire transaction, viewed as a whole, enabled the Debtor to enter into the Educational Provider Agreement which had significant value to the Debtor.  Second, there are questions about the Trustee's ability to establish that the Debtor was insolvent at the time of the transaction or was rendered insolvent by the transaction.  The Trustee's unrefuted testimony was that, at the time the Educational Provider Agreement and promissory note were entered into, the minimum face value of the contract was approximately $1.3 million, compared to the Debtor's obligations at the time of approximately $925,000.  These facts raise significant questions about the Debtor's solvency at the time of the transfer.

2.  *The difficulties in the matter of collection.*

Collection is a non-issue; if the Trustee were successful in the litigation against the Bank, the result would be that the Bank's lien would be avoided, and that lien would be preserved for the benefit of the estate under 11 U.S.C. § 551.  The Trustee testified that if the estate is successful in the claim against the Bank, she would also be able to recover approximately $330,000 paid to the Bank under the note and security agreement.   The court does not believe it would be difficult for the Trustee to collect this amount from the Bank.

3. *The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it.*

Contested lien avoidance litigation, particularly given the likely defenses of the Bank, is necessarily complex and time-consuming.   And, according to the Trustee's testimony, to successfully contest the Bank's defenses, she would be required to hire an accountant or other experts to determine whether the Debtor received reasonably equivalent value and to establish insolvency.   She also testified that to establish her claims against the Bank, much discovery, including many depositions of witnesses involved with the transaction in 2014, would be required.   The Trustee testified that the estate has no funds to pay for such services, and no assets in the case other than the claims against the Bank, the Noss and Ingersoll defendants, and GTA.   She further testified that absent this agreement, she would not be in a position to pursue the claims against the Bank.

4. *The paramount interests of the creditors and a proper deference to their reasonable views in the premises.*

By compromising its claims against the Bank, the estate is giving up its ability to pursue litigation that will be complex and expensive, and which does not have a high likelihood of success.   Although the claims in the adversary proceeding are not being compromised, the Trustee is also agreeing to a set formula for how any proceeds of that litigation will be divided as between the estate and the Bank.  The final *TMT Trailer* factor requires the court to analyze these concessions in the broader context of the benefit the estate will derive from the agreement.   Here, the potential benefits to the estate and creditors are significant.

17

Absent the settlement, the Trustee testified that the estate would not have the funding to pursue the claims against the Noss and Ingersoll defendants, and effectively would have to abandon these claims. The only other way for the estate to continue pursuit of the claims would be by securing litigation funding from the Bank or another source. The estate's eligibility for such funding is highly questionable. But even if such an arrangement could be made, and the estate were to prevail on the adversary claims, the attorney's fees and litigation costs of pursing the claims would likely be reimbursed as administrative expenses under 11 U.S.C. § 503(b). These administrative expenses would reduce the amount of any recovery that would be available to creditors. More importantly, the Trustee testified that she believed any recovery would be subject to the Bank's security interest because such recovery would be proceeds of the Bank's prepetition collateral. This assertion was not challenged by the Objecting Creditors. Even if the Trustee succeeded in avoiding the Bank's lien, the Bank would likely possess a general unsecured claim against the estate, in which case the Bank would receive the lion's share of any distribution made by the estate under 11 U.S.C. § 726.[1] As the case stands today, total claims in the estate are approximately $1,120,968, including the Bank's claim and the claims of the Objecting Creditors. The Bank currently holds 71% of all general unsecured claims. If the claims of the Objecting Creditors are disallowed, which is sought in the adversary proceeding, the Bank's claim would comprise approximately 87% of general unsecured claims, according to the Trustee's testimony. In sum, under this

---

[1]     The Bank filed its proof of claim in this case on August 6, 2019. (*See* Claim No. 5-1.) The total amount of the claim is $804,525.61, with $212,369.00 being listed as secured and $592,156.61 listed as unsecured. The claim was timely filed and properly executed, and no party in interest has objected to it. Accordingly, the proof of claim constitutes prima facie evidence of the validity and amount of the Bank's claim. *See* Fed. R. Bankr. P. 3001(f).

scenario, the costs of pursuing the litigation would be paid first from any potential recovery, and between 71% and 87% of the balance would be paid to the Bank on account of its unsecured claim.

By contrast, the settlement agreement essentially avoids the Bank's lien and fixes and limits the Bank's distribution from any potential recovery in the Noss and Ingersoll adversary proceeding.   In so doing, the settlement allows the estate to avoid costly litigation against the Bank, while also providing litigation funding, including out-of-pocket costs and attorney fees, for the adversary proceeding.[2]  More importantly, by guarantying that 25% of any gross recovery on the adversary claims will be paid to the estate and will not be subject to the claims of the Bank, the Trustee has negotiated a settlement that provides for a potential distribution to **other** unsecured creditors that will not be diluted by the Bank's claim.[3]  By reclassifying the Bank's claim as unsecured, the settlement also forecloses the possibility that the Bank's lien would apply to the proceeds of any funds recovered by the estate on the claims against GTA .  Again, this allows for a potential pro rata distribution to all unsecured creditors, including the Bank.  In reviewing the court's Claims Register, the court notes that other than the Bank and the Objecting Creditors, five other creditors filed timely claims totaling approximately $112,000 in the case.  None

---

[2]      To reiterate, although the Bank might otherwise be entitled to seek compensation for the attorney's fees and costs it incurs in prosecuting the adversary proceeding from the estate as administrative expenses, it has agreed not to do so separately under the terms of the settlement.  Instead, any such fees and costs will be paid from the Bank's 75% share of any gross recovery in the adversary proceeding.

[3]      The court notes that to the extent a resolution may ultimately be reached in the adversary proceeding, the settlement agreement provides that the resolution will be subject to approval by the Trustee and the court under Bankruptcy Rule 9019.   This will give both the Trustee and the court to an opportunity to consider whether a proposed future resolution of the adversary litigation is fair and equitable.

of these creditors objected to the settlement, and that fact carries significant weight.  If the Bank is not successful, these creditors are no worse off than they would be with the Trustee filing a Report of No Distribution.

C.  Objecting Creditors' Position.

The primary objection of the Objecting Creditors is that the settlement is not fair and equitable to Noss.   Although the objection is filed on behalf of the Noss parties as "Objecting Creditors", it really goes to the status of Noss and his entities, not as creditors, but as defendants in the adversary proceeding.  This objection is two-fold.  First, they argue that if the Settlement Agreement is approved, it will preclude Noss – as an LLC member of the Debtor – from bringing a lawsuit "in the right of the limited liability company" against the Bank under Michigan's limited liability act, which apparently would challenge the original transaction with the Bank for failure of consideration.  The court has reviewed the Debtor's Schedule B; the only claim disclosed by the Debtor against Independent Bank is for "improper conduct", not failure of consideration.   Also, by authorizing the filing of the chapter 7 bankruptcy case, Noss, as a member of the LLC, ceded control of the LLC to the Trustee.  All property of the LLC, including claims against the Bank and others, became property of the bankruptcy estate, subject to the exclusive rights and control of the Chapter 7 Trustee.  This includes the right to bring claims on behalf of the Debtor. *See* 11 U.S.C. § 323(b) & § 541; Fed. R. Bankr. P. 6009.  The Objecting Creditors are correct:  the approval of this settlement will bar further claims by the Debtor against the Bank.  If Noss wanted to control those claims, he should not have placed the Debtor in a chapter 7 bankruptcy proceeding in the first place.  Once the petition was filed, those claims belonged to the chapter 7 estate and were subject to the exclusive control of the

20

Trustee. Only if the claims were abandoned pursuant to 11 U.S.C. § 554 would the Trustee cede control to another; the court notes that Noss has not sought abandonment of those claims pursuant to § 554(b).

Second, the Objecting Creditors argue that if the settlement agreement is approved, Noss would be barred by res judicata or collateral estoppel from raising as a defense in the adversary proceeding that the underlying transaction between the Debtor and the Bank should be set aside for failure of consideration. As an initial matter, the court has reviewed the Affirmative Defenses pled in the adversary proceeding. None of them touch upon failure of consideration. If Noss were to raise that issue in the adversary proceeding, and if the Bank were to argue that it could not be raised because of the collateral estoppel or res judicata effect of the settlement, the court would address that issue in the context of the adversary proceeding. While the court will decide that issue if and when it arises in the adversary proceeding, the court doubts that either collateral estoppel or res judicata will apply, given the lack of actual litigation here and given that Noss is not a party to the settlement agreement. In any event, the concern that the settlement could be prejudicial to Noss's ability to raise a future, hypothetical legal argument is too speculative at this time to weigh against approval of the settlement agreement, which is otherwise fair and equitable.

## IV.   CONCLUSION.

The court has reviewed the facts and the law concerning the Trustee's claims against the Bank and against Noss, Ingersoll, and their entities. The Trustee made clear that, aside from the causes of action, there are no other assets in this case. Absent the settlement, this would be a no asset case, and unsecured creditors would receive nothing.

21

Here, the Trustee has analyzed her options, and reached a settlement that may result in a distribution to those creditors at no risk to the estate. The court finds that the proposed settlement agreement is fair and equitable. The Objecting Creditors' objection is overruled, the Trustee's Motion to Approve Compromise is granted, and a separate order will be entered.

**IT IS SO ORDERED.**

**Dated November 6, 2020**



James W. Boyd
United States Bankruptcy Judge